UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

| | |
|---|---|
| ONCOLOGY SPECIALTIES, P.C., | ) |
| Plaintiff/Counterclaim Defendant | ) |
| vs. | ) Case No. 5:15-cv-01078-HGD |
| MCKESSON SPECIALTY CARE DISTRIBUTION CORPORATION, | ) |
| Defendant/Counterclaim Plaintiff | ) |

## MEMORANDUM OPINION

This matter is before the undersigned U.S. Magistrate Judge based upon the consent of the parties pursuant to 28 U.S.C. § 636(c) and Fed.R.Civ.P. 73. Plaintiff, Oncology Specialties, P.C., d/b/a Clearview Cancer Institute (CCI) filed suit against defendant, McKesson Specialty Care Distribution Corporation (MSCD) in Madison County Circuit Court. Subsequently, the matter was removed to U.S. District Court for the Northern District of Alabama.

In its complaint, CCI alleges that, for a significant period of time prior to April 2014, MSCD supplied CCI with oral and injectable pharmaceuticals without a written agreement. Subsequently, MSCD desired to memorialize its supply relationship with CCI in a written agreement. CCI alleges that MSCD agreed to an effective date of April 1, 2014, for this agreement. Further, it alleges that the agreement provided for

an initial term of one year, beginning on this asserted effective date, and would automatically renew unless either party provided written notice of non-renewal at least 90 days prior to the end of the term.

CCI further alleges that, on or about December 31, 2014, it drafted and sent a request for proposal for an oncology drug distribution partnership (RFP) to distributors of oncology medications. According to plaintiff, the RFP was notice to MSCD that it did not intend to renew its existing agreement with MSCD.

According to CCI, on March 31, 2015, it became entitled to a rebate in excess of $400,000 from MSCD, pursuant to their contract. After learning that it failed to win CCI's business under the RFP, MSCD sent a letter to CCI in May 2015 taking the position that the effective date of the agreement was July 3, 2014. It further denied that it received notice of non-renewal and that, as a result, the agreement had automatically renewed for an additional year to end in July 2016. MSCD refused to pay the $400,000 rebate due to CCI under the written contract, alleging that none is owed due to CCI's having first breached the contract.

In addition, MSCD sent a letter to Cardinal Health (Cardinal), the distributor with which CCI entered into a partnership following what CCI asserted to be the expiration of its agreement with MSCD. In the letter, MSCD advised Cardinal that it had an agreement with CCI that ran until July 2016 and demanded that it cease and desist all activities with CCI. CCI alleges that MSCD fraudulently represented to

Cardinal that MCSD's agreement with CCI had an effective date of July 3, 2014 and had renewed through July 2016.

In Count I of the complaint, CCI requests a declaratory judgment declaring that the effective date of the parties' agreement is April 1, 2014, and finding that CCI provided adequate written notice of its non-renewal of the agreement.

Count II alleges fraud by MSCD in that it is alleged to have represented that its agreement with CCI would have an effective date of April 1, 2014, and that CCI would be entitled to a rebate calculated as a percentage of CCI's net purchases from MSCD under the agreement. CCI further alleges that MSCD fraudulently represented to CCI and Cardinal Health that the agreement had an effective date of July 3, 2014, and that CCI failed to timely provide written notice of non-renewal, resulting in a renewal effective until July 2016. It also alleged that MSCD fraudulently represented that it would pay CCI a rebate equal to a percentage of its net purchases of its products, calculated by CCI to be $400,000.

In Count III, CCI alleges fraudulent inducement by MSCD, asserting that it was fraudulently induced to enter into a contract with MSCD based on the latter's representation that the effective date of the contract would be April 1, 2014.

Count IV alleges breach of contract based on MSCD's failure to pay the $400,000 rebate supposedly due at the end of the one-year term ending March 31, 2015.

Subsequent to plaintiff's complaint, MSCD filed a counterclaim asserting a breach of contract by CCI for its failure to provide written notice of its non-renewal of the contract.

Pertinent to the issues currently before the Court, CCI filed a motion for summary judgment with regard to the counterclaim filed by MSCD. (Doc. 47). CCI alleges that the alleged contract that forms the basis of MSCD's counterclaim is unenforceable due to the parties' failure to reach a meeting of the minds on an essential term of the contract. Alternately, CCI alleges that it is due to be granted summary judgment because it provided timely notice of non-renewal and, therefore, did not breach the contract. In addition, CCI alleges that, in the event an enforceable contract exists, MSCD materially breached it prior to any alleged breach by CCI by failing to timely pay the rebate due under the contract.

Likewise, MSCD filed a motion for summary judgment with regard to CCI's claims and in its favor with regard to its counterclaim against CCI. (Doc. 49). MSCD claims that the evidence shows that there was a valid contract effective in July 2014, rather than April 2014, and that CCI breached the contract when it failed to give proper notice of termination 90 days prior to the end of the term.

### DISCUSSION

Evidence reflects that in or around January 2014, Bennett Holtzman, the National Vice President of Sales and Account Management for MSCD, approached

Gary Walton, the CEO of CCI, and began to try to negotiate a written contract between CCI and MSCD. (Holtzman Depo. at 25, 32-33). Holtzman met with Walton and Dr. John Waples of CCI on numerous occasions to discuss a possible agreement. (*Id.* at 33).

On April 21, 2014, Holtzman sent Walton an email which stated as follows:

Gary,

As promised, here's the loyalty agreement that rewards you for staying with McKesson for 1 additional year.

It's 40bp.[1]

We are projecting you at approximately $85M annually.

40bp x $85M equals $340k.

You don't have to do anything differently. Just keep buying from McKesson.

At the end of 1 year, we put a $340k credit on your account.

Let's set up some time to chat this week.

(Holtzman Depo. at Exs. 20, 21).

To this email Holtzman attached an "MVP agreement." The agreement had "April __, 2014" in the top left corner as the date. (*See* Holtzman Depo. at 64).

---

[1] "bp" stands for basis points. It is equal to a .4% rebate. For instance, if CCI purchased $100,000,000 in cancer drugs, it would receive $400,000 in rebates. (*See* Ciarrocchi Depo., Ex. 1, ¶ 3).

However, neither Walton nor anyone else from CCI signed the agreement at that time. The parties continued to engage in negotiations about the proposed agreement from April into June 2014. (*Id.* at 66).

On June 25, 2014, Holtzman sent an email to Walton again asking what MSCD could do for CCI to secure a written agreement. (*See* Holtzman Depo. at Ex. 24). The June 25 email offered a rebate on both injectable and oral drugs. (*See id.*).

On June 26, 2014, Holtzman and Walton had a conversation via text message as follows:

> Holtzman: We've had a handshake deal all these years. I'm asking you to continue to trust me.
>
> Walton: I trust you but this agreement is between CCI and MCK, will either of us be in our same role 6 months or a year from now? Hard to say. If this agreement is effective Apr 1, 2014 and matures Mar 31, 2015 we may have a loophole.
>
> Holtzman: With all the paperwork I just signed, I'm not going anywhere. Every time I advocate for you, I get what I want/what you need. If I backdated this to 4/1, can we get this done?
>
> Holtzman: If yes, sign it, date it 4/1 and we'll work it out on our end.
>
> * * *
>
> Walton: The agreement I have already has April typed in . . .

(Doc. 50-13, June 26, 2014, text message conversation between Holtzman and Walton).

Thereafter, Walton inserted a "1" behind the printed "April" date in the first paragraph of the proposed agreement. (Doc. 50-9, Proposed Agreement with effective date of April 1, 2014). The document noted that this was to make April 1, 2014, the "Effective Date," a defined term within the contract.

An effective date of April 1, 2014, allowed CCI to exit the contract no later than March 31, 2015. (*See* Walton Depo. at 70-73). This would allow CCI to pursue other business opportunities with other vendors who wanted to do business with CCI. (*Id.*). This date also regulated when the rebate would be due to be applied.

Although Walton believed that Bennett could backdate the agreement (Walton Depo. at 115), he also understood that the agreement probably had to go through MSCD's legal department. (*Id*. at 119). He understood that MSCD still had to approve and execute the contract after he signed it. (*Id.* at 121-22).

Subsequently, MSCD signed the contract but changed the effective date to July 3, 2014. (*See* Doc. 50-15, Proposed Agreement with effective date of July 3, 2014). Although Kimberly Pennington with MSCD emailed this document to Walton on July 31, 2014, Walton denies that he received it. The email sent to Walton by Pennington that allegedly contained the altered agreement has a time stamp of 2:48 a.m. and, unlike other emails produced by MSCD, it does not contain an "attachment" line to reflect that the email has an attached document. (*See* Doc. 49-8, email from

Pennington to Walton dated July 31, 2014, at 2:48 a.m.; *compare with* Doc. 49-9, email from Ciarrocchi to Walton dated November 6, 2014, at 10:24 a.m.). Regardless of whether it was received or not, there is no dispute that CCI never agreed in writing to the altered effective date. (*See* Ciarrocchi Depo. at 71-72; Holtzman Depo. at 185).

The agreement provides that "[n]o modification of this Agreement will be effective unless in writing and signed by both parties." (Docs. 50-9 at ¶ 12 and 50-15 at ¶ 12). However, the Alabama Supreme Court has explained:

> [U]nder Alabama law a written agreement may be modified by a subsequent oral agreement of the parties, unless some statutory provision provides otherwise. *Hall v. Integon Life Insurance Co.*, 454 So.2d 1338 (Ala. [1984] ). *This is so even where the contract contains a requirement that all modifications be in writing. Commercial Contractors, Inc. v. United States & Guaranty Co.*, 524 F.2d 944 (5th Cir. 1975) (applying Alabama law).
>
> *Duncan [v. Rossuck]*, 621 So. 2d [1313,] 1315 [ (Ala. 1993) ] (emphasis added).
>
> * * *
>
> The rule allowing proof of an oral modification notwithstanding a requirement that all changes to a contract must be in writing is based upon the premise that a party who has included such a provision in a contract for that party's benefit can certainly waive that provision. *Id.* Proof of an oral modification therefore serves not only as proof of the modification itself but also as proof of a waiver of the requirement for a writing. *Maddox [v. Westcott*, 156 Ala. 492, 47 So. 170, 171 (1908)].

*Ex parte Coleman*, 861 So.2d 1080, 1084-85 (Ala. 2003).

Thus, the question is whether there was some agreement, written or otherwise, to modify the effective date of the contract. The Court determines that there was no such agreement.

Several months after Pennington ostensibly emailed a copy of the modified contract to Walton, there was an exchange of emails between Walton at CCI and Holtzman and Ciarrocchi at MSCD reflecting that CCI believed the effective date of the contract was April 1, 2014, while MSCD believed it was July 3, 2014. (Doc. 50-18, Emails dated December 8-9, 2014).

**Breach of Contract**

Under Alabama law

> "The elements of a breach-of-contract claim under Alabama law are (1) a valid contract binding the parties; (2) the plaintiffs' performance under the contract; (3) the defendant's nonperformance; and (4) resulting damages." *Reynolds Metals Co. v. Hill*, 825 So.2d 100, 105 (Ala. 2002). The elements of a valid contract include: "'an offer and an acceptance, consideration, and mutual assent to terms essential to the formation of a contract.'" *Ex parte Grant*, 711 So.2d 464, 465 (Ala. 1997) (quoting *Strength v. Alabama Dep't of Fin., Div. of Risk Mgmt.*, 622 So.2d 1283, 1289 (Ala. 1993)).

*Shaffer v. Regions Fin. Corp.*, 29 So.3d 872, 880 (Ala. 2009).

A "meeting of the minds" or a mutual assent to the terms of a contract is necessary to the formation of a contract. *See Lilley v. Gonzales*, 417 So.2d 161, 163 (Ala. 1982). Assent must be manifested by something. Ordinarily, it is manifested

by a signature. *See Commercial Credit Corp. v. Leggett*, 744 So.2d 890, 895-96 (Ala. 1999); *Premiere Chevrolet, Inc. v. Headrick*, 748 So.2d 891, 893 (Ala. 1999); *Crown Pontiac, Inc. v. McCarrell*, 695 So.2d 615, 618 (Ala. 1997). While CCI signed the contract with the April 1, 2014, effective date, it did not sign the one dated as effective July 3, 2014. Although MSCD produced an email that purportedly had a copy of the contract with the new effective date attached, the email itself does not reflect that there is an attachment to the contract, and the body of the email does not indicate that the effective date of the contract has been altered. Thus, even presuming that Walton received this email despite his denial, the presumption only applies to the body of the email, not the attachment, because there is no evidence that it was actually attached despite Pennington's language in the body of the email.[2]

On November 6, 2014, MSCD sent a proposed agreement to Walton which was intended to replace the previous contract between the parties. (*See* Doc. 49-9). In paragraph 11 of this document, MSCD noted that upon execution of this agreement, the prior agreement "effective on July 3, 2014" would terminate. (*Id.* at ¶ 11). Walton stated that, while he does not deny that he received this document, he may not have read it in its entirety because the document was never executed. (Walton Depo.

---

[2] This email merely stated: "Gary, Please find the fully executed agreement attached. Let me know if you have questions. Thanks!" Nothing in this wording would put Walton on notice that the "attached" agreement had a different effective date than the one he signed.

at 156). Furthermore, about four weeks later, Walton sent an email to Ciarrocchi and Holtzman regarding new proposals for contracts wherein he states that "[o]ur loyalty rebate (40bps) matures Mar. 31." (Doc. 49-12, Emails dated December 8-9, 2014). In response, Ciarrocchi states that the effective date is July 3, 2014, and will expire on July 2, 2015. (*Id.*). However, in another email, Ciarrocchi tells Walton that he knows CCI wants to make a decision on the new supplier and "go-live with any new agreement for Q2 or latest Q3." Q2 is the quarter beginning April 1, 2015, and Q3 is the quarter beginning July 1, 2015. He does not mention that MSCD believes it has a contract with CCI until July 2, 2015.

It appears that both parties were trying to avoid the issue of the 2014 contract effective date by negotiating a new contract that would make the 2014 effective date irrelevant. Unfortunately, this did not come to pass. Many things are unclear with regard to the dealings between CCI and MSCD. However, one thing is crystal clear as a matter of law; that is, there was no meeting of the minds with regard to the effective date of the 2014 contract. Furthermore, for the reasons stated above, the effective date is an essential term to this contract. Because there was no meeting of the minds, or mutual assent, as to all the essential terms of the contract, the contract is void.

Because the contract is void, neither party can be liable for breaching it. Therefore, CCI's motion for summary judgment on MSCD's counterclaim is due to be granted. Likewise, MSCD's motion for summary judgment with regard to CCI's claim of breach of contract is also due to be granted.

**<u>Fraud and Fraudulent Inducement</u>**

Under Alabama law, in order to prove a fraudulent inducement claim a plaintiff must show that (1) the defendant had a duty to speak the truth; (2) the defendant made a false representation of a material fact; (3) the plaintiff reasonably relied on the false representation; and (4) the plaintiff suffered loss, harm, or damage as a proximate result of the false representation. *See McGriff v. Minnesota Mut. Life Ins. Co.*, 127 F.3d 1410, 1414 (11th Cir. 1997); *Kidder v. AmSouth Bank, N.A.*, 639 So.2d 1361, 1362 (Ala. 1994). "However, the law places a heavier burden in those fraud actions where one attempts to prove fraud based on a misrepresentation relating to an event to occur in the future." *National Sec. Ins. Co. v. Donaldson*, 664 So.2d 871, 876 (Ala. 1995). A fraud claim in which the alleged fraud concerns a future promise, as opposed to a present fact, is known as promissory fraud. *See McGriff*, 127 F.3d at 1414. "In promissory fraud, the material existing fact that is misrepresented is the defendant's state of mind, when the defendant represents that he intends to perform some act although he does not in fact intend to perform it." *Spring Hill Lighting &*

*Supply Co., Inc. v. Square D Co., Inc.*, 662 So.2d 1141, 1149 (Ala. 1995); *see also Green v. Lumpkin* (*Ex Parte Lumpkin*), 702 So.2d 462, 466 (Ala. 1997). To prove promissory fraud, the plaintiff must additionally show that, at the time of the alleged misrepresentation (the promise), the defendant did not intend to do the act or acts promised and intended to deceive the plaintiff. *See McGriff*, 127 F.3d at 1414; *Goodyear Tire & Rubber Co. v. Washington*, 719 So.2d 774, 776 (Ala. 1998).

Evidence reflects that although Walton was assured that Holtzman would go to bat for him regarding the effective date and that Holtzman had always been able to deliver what Walton wanted in the past, Walton's testimony is clear that he knew the contract would have to be reviewed by the MSCD legal department and be approved and executed before it was accepted by MSCD. Consequently, if there is any fraud, it is promissory fraud – a promise by Holtzman that he could get the backdated contract approved by MSCD. While Walton testified that he believed Holtzman had the authority to authorize the backdating of the contract, he also knew that the contract had to receive the approval of the MSCD legal department and had to be executed by them before it was valid. Furthermore, Holtzman told Walton that, whenever he went to bat for him, he got what he wanted. This clearly implies that, while Holtzman had always been successful in the past, he, nonetheless, would have to get approval for the backdated contract to be accepted by MSCD. In his own

testimony, Walton stated he did not believe Holtzman was lying to him when he told him to date the document April 1, 2014, and that he would go to bat for him. Because there was no intent to deceive Walton at the time Holtzman made this promise, there is no promissory fraud.

Furthermore, despite any promise by Holtzman to get this accomplished, the statements by Holtzman were not misleading in that regard. He promised to "go to bat" for Walton regarding the backdated document. There would be no need for Holtzman to "go to bat" for Walton if he had unfettered authority to backdate a contract. Walton did not believe Holtzman was being untruthful at this time and there is no other evidence that he was lying to Walton. Furthermore, there is no evidence that Holtzman's representations were negligently made. He stated he would go to bat for him and that, when he had done so in the past, he had been successful. Unfortunately for Walton, on this occasion, Holtzman was unsuccessful. Nonetheless, even if the claim is one of ordinary fraud in the inducement, this claim cannot succeed because there is no evidence of a false representation of a material fact.

Further, because there is no evidence that MSCD believed that the effective date of the contract was any date other than July 3, 2014, or that the contract had not

renewed through July 2016, any representation by MSCD in its letter to Cardinal was not fraudulent.

Consequently, MSCD's motion for summary judgment on CCI's demand for a declaratory judgment, that the effective date of the contract was April 1, 2014, and its claims that MSCD fraudulently represented that the effective date would be April 1, 2014, fraudulently induced CCI to enter into the contract on this basis, and fraudulently advised Cardinal Health that MSCD had an ongoing contract with CCI is due to be granted.

## CONCLUSION

Based on the foregoing, all claims of all parties are due to be dismissed. A final order in accordance with this Memorandum Opinion will be entered separately.[3]

---

[3] Under the doctrine of quasi-contract, the law implies a contract, based upon the principles of equity, to prevent the unjust enrichment of one who knowingly accepts and retains a benefit provided at the detriment of another, who has a reasonable expectation of compensation or other benefit. *Utah Foam Prods., Inc. v. Polytec, Inc.*, 584 So.2d 1345 (Ala. 1991); *Opelika Prod. Credit Ass'n v. Lamb*, 361 So.2d 95 (Ala. 1978); *Hendrix, Mohr & Yardley, Inc. v. City of Daphne*, 359 So.2d 792 (Ala. 1978). "The remedy of quasi-contract is based upon the established principle of avoiding unjust enrichment. For this remedy to apply, there must be a detriment and a resulting benefit, and the two must be related." *G.S. Gothard & Son Contractors, Inc. v. Mansel*, 611 So.2d 1101, 1103 (Ala.Civ.App. 1992) (citations omitted). However, there is no claim by CCI that it is entitled to "loyalty" rebates based on quasi-contract for any time period between April 1, June 24, or July 3, 2014, to in or around December 8, 2014, when it was undeniably aware that there was a lack of mutual assent to the terms of the contract. CCI continued to business with MSCD under the mistaken belief that it was getting loyalty credits for continuing to do business with MSCD when, arguably, it could have gone elsewhere for its needs. However, since no such claim was made, the Court does not address it.

DONE this 24th day of May, 2017.

  _____
  HARWELL G. DAVIS, III
  UNITED STATES MAGISTRATE JUDGE

---

In addition, the Court notes that the elements of the tort of tortious interference with business or contractual relations under Alabama law are "(1) the existence of a protectible business relationship; (2) of which the defendant knew; (3) to which the defendant was a stranger; (4) with which the defendant intentionally interfered; and (5) damage." *White Sands Grp., L.L.C. v. PRS II, LLC*, 32 So.3d 5, 14 (Ala. 2009). CCI alleges in the factual background of the complaint and within its fraud count that MSCD fraudulently represented to Cardinal Health that MSCD and CCI had an agreement in effect through July 2016, demanded that Cardinal cease and desist all activities with CCI, and "knowingly and intentionally interfered with [CCI's] contractual relationship with Cardinal." (Doc. 1-1, Complaint, at ¶¶ 16, 17 and 26). CCI has not set out a separate count alleging tortious interference with its business or contractual relations with Cardinal. Therefore, the Court also does not address this allegation except as it relates to CCI's fraud claim.